UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| CHRISTOPHER J.M. LEWIS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:13cv495 (DJS) |
| | : | |
| LIEUTENANT SWICKI and | : | |
| CAPTAIN BUTKIEWICUS, | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION

The plaintiff, Christopher J.M. Lewis ("Lewis"), brings this action pursuant to 42 U.S. § 1983, alleging that the defendants, Lieutenant Swicki[1] ("Swicki") and Captain Butkiewicus ("Butkiewicus"), violated his rights under the Eighth Amendment to the United States Constitution. The plaintiff, who is an inmate at a facility operated by the Connecticut Department of Correction ("DOC"), claims that the defendants failed to prevent another inmate from assaulting him. Pending before the Court is the defendants' motion for summary judgment. For the reasons stated below, the defendants' motion is granted.

STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A dispute about a material fact is

---

[1] It appears from some of the defendants' filings that the correct spelling of this defendant's name may be "Siwicki." Because both the district court and the Court of Appeals have consistently used the spelling Swicki, which is how the name appears in the case caption, this Court will continue to use that spelling.

"genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248.

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys,* 426 F.3d at 553. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Liberty Lobby,* 477 U.S. at 252. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "[A]fter adequate time for discovery and upon motion," summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

FACTS

Lewis, an inmate confined by the DOC, was transferred to Northern Correctional Institution ("Northern") after being identified as being a member of a security risk group and was placed in Administrative Segregation as part of the Security Risk Group Threat Member Phase I Program ("SRGTM program" or "Program"). The SRGTM Program consists of a heightened security environment because of the potential for assaultive behavior stemming from gang affiliation. Inmates in the SRGTM program are at all times restricted to their cells except for recreation, medical issues, visitation, and phone calls.

Program inmates are subject to continuous observation every 15 minutes and are handcuffed from behind their backs and escorted whenever they leave their cells.[2] DOC policy requires Program inmates to be searched before they enter the recreation yard and to participate in recreation while handcuffed behind their backs. While Program inmates are in the recreation yard, DOC officers observe them from a window.

In July 2010, Lewis was involved in an incident with two other Northern inmates, Inmate Mulligan ("Mulligan") and Inmate Trabakoulos ("Trabakoulos"). Lewis described this incident as follows: "[T]here were discrepancies going on, politics, and we wasn't [sic] seeing eye to eye." (Doc. # 47-4, at 23, p. 18:2-3). During this incident someone threatened Lewis, but he did not report that threat to anyone. A report concerning this incident was prepared by Swicki in July 2010.[3]

At all times pertinent to this action, Swicki was the Intelligence Supervisor at Northern. At a meeting in August or September 2010 Swicki told Lewis there was "information that an

---

[2]In his Local Rule 56 (a)2 Statement, Lewis contends that in 2010, restraints were not authorized for Program participants unless they were being moved to Restrictive Housing, and he suggests that handcuffing Program inmates whenever they leave their cells "does not necessarily reflect practices which were followed in 2010 and could reflect current policy in 2016." (Doc. # 50-1, at 1, ¶ 4). In his Second Amended Complaint, Lewis alleges that the policy of handcuffing all Program inmates behind their backs "when removed from their cell and as well during their recreation period . . . became effective October 9, 2009." (Doc. # 37, at 2, ¶ 9). At his deposition, Lewis agreed that when Program inmates go out for recreation they are handcuffed from behind and "while the inmates are out in recreation, they are all still handcuffed." (Doc. # 47-4, at 18, p. 13:20-25). The Court finds there is no genuine dispute as to this material fact.

[3]The July 2010 report concerning this incident is not in the record. According to Swicki, the only thing documented in the incident report was "the disagreement" between Lewis and the other two inmates. (Doc. # 47-6, at 3, ¶ 6).

assault was going to be against you." (Id. at 38, p. 33:11-12).[4] Prior to his September 2010 transfer to Butkiewicus' cell block, Unit 2E, Lewis met with Swicki and Butkiewicus. At that meeting Swicki and Butkiewicus told Lewis they were aware of the July incident involving Lewis, Mulligan, and Trabakoulos, and Swicki told Lewis that his safety "can be at jeopardy."[5] (Doc. # 47-4, at 40, p. 35:13).

In July 2010, Swicki intercepted written inmate communications in which Lewis was described as having disagreed with "PIRU Bloods"[6] rules and had been accused of breaking them. Those communications also indicated that Mulligan had reportedly decided that Lewis "was done." In his affidavit, Swicki states that he "interpreted this to mean that Inmate Mulligan had decided to terminate Inmate Lewis's membership in the PIRU Bloods." (Doc. # 47-6, at 2, ¶ 5).

Neither Swicki nor Butkiewicus ever told Lewis that Trabakoulos or any other particular inmate was threatening him with harm. Lewis testified at his deposition that Swicki and Butkiewicus told him that "in my organization, which is Piru [PIRU], somebody is going to attack me." (Doc. # 47-4, at 44, p. 39:10-11). Trabakoulos was a member of PIRU. While Lewis

---

[4]Swicki denies ever telling Lewis that he had been threatened. Lewis testified at his deposition, however, that Swicki did tell him there was information he was going to be assaulted. For purposes of the motion for summary judgment the Court is "bound to consider the facts in the light most favorable to . . . the non-moving party." *Simpson v. City of New York*, 793 F.3d 259, 262 (2d Cir. 2015).

[5]Swicki and Butkiewicus both deny these facts, but they are supported by Lewis's deposition testimony and the Court is bound to accept these facts as true for the purpose of ruling on the pending motion

[6]The term "PIRU Bloods" refers to a gang. At that time Mulligan was the leader of that gang within Northern.

had differences with Trabakoulos, he never told anyone that he was afraid Trabakoulos would assault him.

On November 25, 2010, Trabakoulos and Lewis, both of whom were housed on Unit 2E, were in the recreation yard at the same time. Although Trabakoulos was handcuffed behind his back, he was able to slip one of his hands out of the handcuffs and place his hands in front of his body. Trabakoulos had been searched before he went into the recreation yard, but he was able to smuggle a 4-inch piece of metal into the yard and used it to assault Lewis. At the time of the attack, Lewis was handcuffed behind his back and unable to protect himself. He suffered wounds to his face and neck but did not receive stitches.

Swicki conducted an investigation of the November 25, 2010 attack. During the course of his investigation, Swicki interviewed several Northern inmates. In his report of the investigation, Swicki noted that one of those inmates, Kareen Mayo ("Mayo"), "speculated that the assault was a standing order left by ex-doc inmate Christian Mulligan . . . who was the leader of the Piru blood set." (Doc. # 47-5, at 4). Swicki's report went on to note that, according to Mayo, the July 2010 incident involving Lewis, Mulligan, and Trabakoulos, led to Mulligan "plac[ing] a hit on inmate Lewis . . . for his disrespect and violation of blood rules. Inmate Trabakoulos was to carry out the hit because he . . . was inmate Mulligan's 'Drop' meaning that inmate Mulligan brought Trabakoulos into the Piru bloods and was responsible for him as a Piru." (*Id.*).

"Based on [his] review of the . . . surveillance footage of the incident as well as intelligence gathered through interviews," Swicki concluded that the assault on Lewis resulted from a standing order that had been issued by Mulligan prior to his transfer out of state. (*Id.* at 5).

He further concluded that Mulligan's order to assault Lewis "stem[med] from a disagreement between inmates Lewis, Mulligan and Trabakoulos as documented in a July 2010 incident report." (*Id.*).

DISCUSSION

Lewis alleges that Swicki and Butkiewicus violated his rights under the Eighth Amendment when they knew that he faced a substantial risk of harm at the hands of Trabakoulos but failed to take action to protect him from that harm. To succeed on an Eighth Amendment claim based on a failure to prevent harm, an inmate must show that: (1) the conditions of his incarceration pose a substantial risk of serious harm; and (2) the defendants were deliberately indifferent to his health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference in this context requires that the prison official knows that the inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

In their motion for summary judgment, the defendants argue there is no evidence that Lewis was incarcerated under conditions presenting a substantial risk of serious harm, and there is no evidence that they consciously disregarded a substantial risk of serious harm to him. Each of these contentions will be discussed below.

I. Substantial Risk of Serious Harm

"In determining whether a substantial risk of harm existed, the Court should not assess a prison official's actions based on hindsight but rather should look at the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. County of Suffolk*,

755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (internal quotation marks omitted). At the time Trabakoulos assaulted Lewis, November 25, 2010, the defendants were aware of the following facts and circumstances: Lewis had been involved in an incident with Trabakoulos and Mullligan in July 2010. That same month Swicki intercepted written inmate communications in which Lewis was described as having disagreed with and broken PIRU Bloods rules. Those communications also indicated that Mulligan had reportedly decided that Lewis "was done."

At a meeting in August or September 2010 Swicki told Lewis there was information that someone was going to assault him. Prior to Lewis's transfer to Unit 2E he met with Swicki and Butkiewicus. They told Lewis they were aware of the July incident involving Lewis, Mulligan, and Trabakoulos, and Swicki told Lewis that his safety could be in jeopardy. According to Lewis, Swicki "sa[id] vaguely that there's information of me being in the future going to get assaulted." (Doc. # 47-4, at 39, p. 34:24-25). Neither Swicki nor Butkiewicus ever told Lewis that Trabakoulos or any other particular inmate was threatening him with harm, and Lewis never told anyone that he was afraid Trabakoulos would assault him.

Under these facts and circumstances the Court is hard-pressed to conclude that a substantial risk of harm existed. Although a prison official cannot avoid liability under the Eighth Amendment by arguing that, "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault"; *Farmer*, 511 U.S. at 843; the question in this case is whether the defendants were "aware of an obvious, substantial risk" to Lewis's safety. Lewis's own testimony regarding this issue was somewhat uncertain and ambiguous. At one point Lewis answered "yes" when asked by his attorney whether Swicki told him that somebody

was going to attack him. Describing Swicki's statements to him in his own words, however, Lewis testified that Swicki "vaguely sa[id] that there's an issue brewing, but he didn't get into detail with Butkiewicus until I left [the meeting]."[7] (Doc. # 47-4, at 40, p. 35:5-7). When asked what specific words Swicki used in conveying this information to him, Lewis said: "That my safety can be at jeopardy." (*Id.* at 40, p. 35:13).

Additionally, four months had passed between the time of the July incident and the November assault. There is no evidence of any threat against Lewis, or any interaction between Trabakoulos and Lewis, during that four month period. Other courts considering the issue of substantial risk of harm in cases involving an assault on an inmate by another inmate have looked at factors such as whether the defendants "had any advance warning that such an attack was imminent"; *Colon v. Furlani*, 07-CV-6022L, 2008 U.S. Dist. LEXIS 94154, at *9 (W.D.N.Y. Nov. 19, 2008); or there was "a strong likelihood rather than a mere possibility that violence will occur." *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985) (internal quotation marks omitted). *Cf. Hartry*, 755 F. Supp. 2d at 436 (internal quotation marks and alterations omitted) ("When a prisoner is subjected to specific threats from another inmate, and there are indications that the threat will be carried out, the failure of prison officials to act may give rise to a deliberate indifference claim."). The Court concludes that Lewis has failed to present evidence that would reasonably support a finding that the conditions of his incarceration posed a substantial risk of serious harm.

---

[7]There is no evidence before the Court regarding anything said by Swicki or Butkiewicus after Lewis left the meeting.

II. Deliberate Indifference

Even if Lewis had demonstrated that the particular conditions of his incarceration posed a substantial risk of serious harm, the facts before the Court fail to demonstrate deliberate indifference on the part of either defendant. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Lewis suggests that the defendants failed to take reasonable measures to abate the substantial risk of harm to him by housing him somewhere other than where Trabakoulos was housed. In the first instance, there is no evidence that any threat of harm to Lewis was linked specifically to Trabakoulos, nor is there evidence of how many other PIRU Bloods were at Northern or where they were housed. In any event, the procedures in place at Northern pertaining to Program inmates virtually preclude a finding of deliberate indifference. All Program inmates, including both Lewis and Trabakoulos, were handcuffed from behind their backs and escorted whenever they left their cells. All Program inmates were searched before they entered the recreation yard[8] and remained handcuffed behind their backs while they were in the recreation yard. During their recreation periods, Program inmates were observed from a window by DOC officers. Lewis does not claim that either defendant was personally involved in any deviation from these strict procedures. Under these circumstances, the Court concludes that Lewis has not, contrary to his assertions, "produced sufficient evidence to raise an issue of material fact on the

---

[8]The original Complaint in this action named as a third defendant the DOC officer who conducted a strip-search of Trabakoulos before he entered the recreation yard on November 25, 2010. The claims against that defendant were dismissed at an earlier point in the litigation.

issue of whether an attack was reasonably foreseeable and whether the defendants' failure to take pre-emptive action to protect the plaintiff was unreasonable." (Doc. # 50, at 6).

CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment (**doc. # 47**) is **GRANTED**.

The Clerk is directed to enter Judgment in favor of the remaining defendants, Lieutenant Swicki and Captain Butkiewicus, and close this case.

SO ORDERED this 27th day of September, 2017.

/s/ DJS
Dominic J. Squatrito
United States District Judge